## Citizens' Party Nomination Papers.

*Election law—Nomination papers—Piecing papers together—Affidavit as to signatures—When amendments not allowed—Act of July 9, 1919.*

1. When, under the Act of July 9, 1919, P. L. 855, the Secretary of the Commonwealth furnishes a blank form of nomination paper, no other person has any right to vary or modify such form.

2. A nomination paper consists of only one sheet, with spaces on the face of it for the names of the candidates nominated and electors, and on the back for the affidavit vouching the signatures.

3. The taking of a number of distinct nomination papers and fastening them together is an attempt to use a "form" other than the one furnished by the Secretary of the Commonwealth and is contrary to law.

4. Where an affidavit on the back of the last of a large number of nomination papers fastened together sets forth that "the signatures attached to the foregoing nomination paper are in the proper handwriting of the qualified electors named therein," the court will not hold that the affidavit on the last paper applies to all the other preceding papers.

5. When nomination papers bear evidence that they were not signed by the persons whose signatures they purport to bear, and also bear evidence on the face of other fraud and corruption, they cannot be amended after they are filed.

6. If the last day for filing a nomination paper has not gone by and the paper is improper or deficient in its averments, it may be withdrawn and a valid paper substituted therefor.

Petition to set aside nomination papers. C. P. Lackawanna Co., Nov. T., 1925, No. 701.

*J. J. Levy, R. H. Harris* and *E. J. Kelly,* for petition.

*David J. Reedy* and *Stanley F. Coar,* contra.

MAXEY, J., Oct. 16, 1925.—The basis of this proceeding is a petition of qualified electors of the County of Lackawanna to set aside and declare void the papers purporting to nominate the persons hereinafter named as candidates of the "Citizens' Party" for the respective offices named for the County of Lackawanna. The petitioners set forth six reasons why said papers should be set aside and declared void. The first objection is as follows: "There was no certificate from the Prothonotary of Lackawanna County, as required by the Act of Assembly of July 9, 1919, P. L. 855, setting forth compliance in accordance with said Act of Assembly of July 9, 1919, P. L. 855, filed with the said nomination papers filed by the said 'Citizens' Party' as a political body."

The facts are these: The only paper filed with the nomination papers was a copy of an affidavit of adoption of a political appellation, with an endorse-

ment on it as follows: "Certified from the records this 21st day of September, 1925. John B. Griffiths, Prothonotary, by Wenzel."

The objectors contend that this copy so filed with the nomination papers is a mere certified copy of an affidavit of adoption and does not constitute a "certificate from the prothonotary setting forth a compliance with the act." The argument is that the stamp or statement bearing the signature of Clerk Wenzel is neither in substance nor form the "certificate from the prothonotary" which the Act of July 9, 1919, P. L. 855, specifically requires. It is also contended that, even if it were a certificate in due form, it would have to be signed by the prothonotary or deputy prothonotary, and that such a certificate with only a clerk's signature attached to it would be a mere nullity.

These contentions of the objectors have in them much merit, but since we find the nomination papers void on other grounds, we do not formally decide the question raised by objection No. 1.

### Second objection to the nomination papers.

The second objection sets forth as follows: "The signatures to each nomination paper and the qualifications of the signers are not vouched for by the affidavit of at least five of the signers thereof."

Section 3 of the Act of July 9, 1919, P. L. 855, provides, *inter alia*, as follows: "Nominations of candidates for any public office may also be made by nomination papers signed by qualified electors of the State or of the electoral district or division thereof for which the nomination is made. . . . Each elector signing a nomination paper shall add to his signature his place of residence and occupation, and no person may subscribe to more than one nomination for each office to be filled. The signatures to each nomination paper and the qualifications of the signers shall be vouched for by the affidavit of at least five of the signers thereof, which affidavit shall accompany the nomination paper."

### The facts discussed.

The nomination papers which were filed by the persons who purported to represent the Citizens' Party consisted of thirty-three separate nomination papers. These papers as now before us have two rivets and a fastener in the upper left-hand corner and a rivet in the upper centre of the nomination papers. The papers, numbered 11 to 25, inclusive, have a rivet in the upper right-hand corner. These fifteen nomination papers were evidently fastened together first and *later* incorporated in the entire bundle of thirty-three nomination papers. The thirty-three nomination papers contain many groups of names in the same handwriting. For example, on nomination paper No. 6 there are the names of thirty-two electors obviously written by the same hand, and the handwriting expert so testified (record, pages 34, 35, 36). On nomination paper No. 8 there are the names of eleven electors obviously written by the same hand, and so testified to by the expert (record, page 36). On nomination paper No. 10 there are the names of twenty-three electors obviously written by the same hand, and the expert explicitly testified (record, page 37) that at least eleven of these signatures were in the same handwriting. On the lower part of nomination paper No. 12 there are the names of eighteen electors obviously written by the same hand. On the bottom of nomination paper No. 2 there are the names of eighteen electors obviously written by the same hand. The same significant duplication of handwriting in the names of electors occurs throughout these thirty-three nomination papers.

Each one of these thirty-three nomination papers is in form complete in itself. Each one of these papers is headed: "Commonwealth of Pennsyl-

vania. Nomination Paper. We, the undersigned, all of whom are qualified electors of the County of Lackawanna, State of ·Pennsylvania, representing the Citizens' Party or Policy, hereby nominate the following persons:"

Then follow the names of the eight candidates for the respective county offices to be filled at this fall's election, with the profession, business or occupation of the candidates, place of residence and the office for which nominated. On the reverse side of each one of these papers is a blank form for the affidavit of five of the signers thereon, vouching for the signatures and qualifications of the signers of the nomination paper. But none of these papers are filled out and subscribed to as the law requires, except on the reverse side of nomination paper No. 33.

The objectors contend that the signatures to these nomination papers, with the qualifications of the signers, should be vouched for by the affidavit of at least five of the signers thereof; and they contend that by "nomination paper" is not meant the entire thirty-three nomination papers, but each separate nomination paper, which is a distinct unit in itself. While there is a plurality of nomination papers, to wit, thirty-three nomination papers, the affidavit on the back of nomination paper No. 33 simply refers to "the foregoing nomination paper." This nomination paper, No. 33, standing by itself, answers perfectly to the description of "the foregoing nomination paper" and is obviously the "nomination paper" that Geiger, Quinn, Flynn, Healey and McNulty swore to.

Further evidence that these thirty-three nomination papers do not constitute one nomination paper but are distinct papers is found in the fact that the names of the candidates for county office on nomination papers 1, 2, 3, 4 and 5 are in the same handwriting, but that the names of these candidates on nomination paper No. 6 are in a different handwriting, and the names of these candidates on nomination paper No. 7 are typewritten. The writing of names of the candidates on later nomination papers differs in several instances from the handwriting of the names of the candidates on the papers already referred to.

Counsel for the respondents ask us to treat these thirty-three distinct nomination papers as only one nomination paper and ask us to believe that William J. Geiger, William C. Quinn, Eugene Flynn, Joseph Healey and Charles A. McNulty, who signed the oath on the back of the thirty-third nomination paper, actually intended their oath to apply to the 1215 names contained in these thirty-three nomination papers, and that these five affiants actually knew that the 1215 signatures attached to said nomination papers were in the proper handwriting of the qualified electors named therein, and that all the persons whose signatures are attached to said nomination papers were qualified electors of Lackawanna County, State of Pennsylvania. This may be possible, but it is not probable. The 1215 alleged signers reside in different parts of Lackawanna County. It is not likely that any five men in Lackawanna County could truthfully swear to the handwriting of 1215 widely separated citizens of Lackawanna County, or even that such a large number of men were qualified electors of Lackawanna County, unless these five persons actually saw the 1215 electors write their names on the nomination papers and actually interrogated them as to their qualifications as electors. We do not believe that Messrs. Geiger, Quinn, Flynn, Healey and McNulty did or could swear to the genuineness of the 1215 names on these thirty-three nomination papers. If they did so swear, what they swore to could not be true, as in a number of instances the names of large groups of electors were not in the proper handwriting of the electors, but were written by one and

the same person. The genuine signatures of no two persons are the same. One individual's signature is as distinct from another individual's signature as are his fingerprints, or more so.

These thirty-three nomination papers conclusively indicate that they were circulated by different persons and not by any one group of men. For example, on nomination papers Nos. 1 and 2, every name of an elector is followed by the number, street and municipality in which the elector resides, while nomination paper No. 6 contains the names of the twelve electors, followed only by the number and name of the street on which the elector resides. Eight of these names, obviously written by the same person, are followed by the words "Boulevard Avenue" or "Rear Boulevard Avenue," or by the number on Boulevard Avenue. Where Boulevard Avenue is located does not appear. In the knowledge of this court there are at least two Boulevard Avenues in Lackawanna County. On the bottom of nomination paper No. 6 there are the names of four electors, obviously in the same handwriting. Two of these names are followed simply by the address "622 Morgan Street," and two of them by the address "Wilson Court." Where Morgan Street and Wilson Court are located does not appear. On nomination paper No. 8 there are the names of twenty-one electors without the names of the municipalities in which they reside. On nomination paper No. 12 there are the names of nine electors who do not enlighten us as to their places of abode. On nomination paper No. 27 are the names of twenty-four electors who apparently forgot to write down the municipalities in which they reside; but some other person supplied this omission, for the word "Scranton" is written twenty-four times in the same handwriting, but in writing different from the names of the electors whose address is thus given as Scranton. On nomination paper No. 28 there are the names of twenty-nine electors who leave us in the dark as to the municipalities in which they reside. The persons who circulated nomination papers Nos. 1 and 2 were careful to see to it that the elector's complete address was given, but the persons who circulated the nomination papers above mentioned were careless and omitted to have the alleged signers write in their complete addresses.

Hugh J. Brady, a well known political leader of Archbald, signed his name on nomination paper No. 5 and also obviously signed his wife's name on nomination paper No. 5. The same Hugh J. Brady signed his name to nomination paper No. 25, and the same Brady obviously signed James Ruane's name on nomination paper No. 25. If these thirty-three nomination papers had all been circulated as one paper or as a unit, as respondent would have us believe, it is not likely that Hugh J. Brady would have signed both nomination paper No. 5 and nomination paper No. 25. The same argument applies to the case of John J. Munley, who signed both nomination paper No. 3 and nomination paper No. 10.

### The law discussed.

A "nomination paper" has a distinct legal meaning. Section 3 of the Act of July 9, 1919, P., L. 855, provides, *inter, alia*, as follows: "Blank forms for making such nominations shall be furnished by the Secretary of the Commonwealth, *and no other form than the one so prescribed shall be used for such purpose.*"

When the Secretary of the Commonwealth furnishes a form of nomination paper, no other person in the Commonwealth has any right to vary or modify that form. The Secretary of the Commonwealth has furnished a blank form for making nominations for county offices, and this form consists of one, and

only one, sheet of paper, with proper headings thereon, with spaces at the head of said paper for the names, addresses and occupations of the candidates for county offices, and spaces below for the signatures, addresses and occupations of thirty-five electors; and on the reverse side of said single sheet is a form of vouchment for the signatures on said nomination paper and for the qualifications of the signers, by the affidavit of at least five of the signers of said paper, and this affidavit "shall accompany the nomination paper." No citizen has any right to fasten thirty-three of these distinct nomination papers together and ask to have them accepted as a new form of nomination paper. As a matter of fact, we find that the thirty-three nomination papers in evidence before us were not fastened together before they were circulated, but that they were circulated separately by different groups of people. However, if they had been so fastened together before they were circulated and had been circulated by the same group of persons, these thirty-three sheets used as one nomination paper would be invalid as a nomination paper, as the thirty-three sheets together would constitute a form "other than the form prescribed by the Secretary of the Commonwealth," and would be in violation of the legal provision that "no other form than the one so prescribed (by the Secretary of the Commonwealth) shall be used for such purpose," to wit, for the nomination of candidates for public offices. A form with spaces for 1155 names of electors is utterly different from a form with spaces for the names of only thirty-five electors (to say nothing of the separate spaces on each of the thirty-three sheets for the names of candidates for county offices). Such a form, if used, would be void as being in contravention of the explicit provision of the law. All nomination papers must be uniform. A nomination paper consisting of thirty-three distinct sheets is not uniform with a nomination paper of one sheet. To combine thirty-three distinct sheets into one form is to create a new and distinct form, the same as physically attaching two or more dwelling-houses together as the abode of one family would constitute a distinct form of house.

The dictionary definition of "form" sustains our argument. The New Standard Dictionary defines "form" as "the outward or visible shape of a body," and as "the established or prescribed method," and as "the appearance or character in which a thing presents itself." Applying these definitions to the question before us, the "outward or visible shape" of a nomination paper consisting of one sheet is utterly at variance with the "outward or visible shape" of a nomination paper consisting of thirty-three sheets riveted together.

Further applying the definition, when the Secretary of the Commonwealth "prescribes" as "the method" of making nominations the signing of names to one sheet, this prescription as to method is violated by offering names on thirty-three sheets attached together.

Further, the "appearance or character" of thirty-three sheets of paper riveted together is utterly different from the "appearance or character" of one sheet, as prescribed by the Secretary of the Commonwealth.

Webster's Dictionary defines "form" as "the shape and structure of anything, as distinguished from the material of which it is composed; particular disposition or arrangement of matter, giving it individuality or distinctive character."

The "shape and structure" of thirty-three loose sheets fastened together crudely at the top is entirely different from the "shape and structure" of one sheet prescribed by thte Secretary of the Commonwealth under authority of law.

When the Secretary of the Commonwealth sends out a form of nomination paper for nominating candidates for county offices and this form consists of one sheet, this one-sheet form becomes, under the law, the only legal form that can be used for nominating candidates for county offices, and is as much the only legal form that can be used as if the act itself said: "Each nomination paper nominating candidates for county offices shall consist of one sheet only, and nomination papers consisting of more than one sheet shall not be used."

It has long been the custom in this Commonwealth and in this county for candidates for office to circulate nomination papers precisely in the form as they are received from the Secretary of the Commonwealth and to have attached to each distinct nomination paper the affidavit of at least five of the signers thereof vouching for the signatures to such nomination paper and the qualifications of the signers. In Yost's Appeal, 253 Pa. 551, in the opinion of the lower court, appeared the following phrase: "The nomination petition consists of twelve sheets, to each of which is attached an affidavit in which the affiant vouches for all the signatures on the sheet." The court below held that this was correct and sufficient, and the Supreme Court sustained the lower court in this. This case illustrates the fact that the practice is followed in this Commonwealth of making an affidavit on each separate nomination paper, and this practice is evidently approved by the Supreme Court.

A "nomination paper" is as distinct a thing as any other definite paper prescribed by law. A candidate's nomination *petition* is not a definite legal unit. It consists of as many nomination papers as the candidate and his friends have filled out in legal form. It might be one paper or a hundred, provided they are all legally executed, but a nomination paper, under the law and in accordance with the "form" furnished by the Secretary of the Commonwealth, is only one paper. A candidate or citizen can no more change the thickness of that "form" or alter or add to the one sheet of which it consists than he could alter its length or breadth.

On the petition before us the names of the county candidates proposed are written or typewritten on each nomination paper, and they appear not once, but thirty-three times in this packet of nomination papers. If we treat these thirty-three distinct nomination papers as one, then we have a "form" used that is not "furnished by the Secretary of the Commonwealth," and, hence, cannot legally be used. If we regard the packet as thirty-three distinct nomination papers, which it actually is, then only one of them is valid, for the others are not accompanied by the affidavits required by law.

If there should be presented to a bank thirty-three promissory notes fastened together, each for $1000, each complete in itself, except that thirty-two of them were not endorsed, and only the thirty-third note contained the endorsement of "A," would any banker accept these thirty-three notes as *one* note for $33,000 duly endorsed by "A"? Would any bank attempt to hold "A" as endorser for said entire indebtedness of $33,000? Would any court treat the endorsement of "A" on the back of one of these thirty-three notes as an obligation to pay the entire indebtedness evidenced by the thirty-three notes? This endorsement could not attach to all these notes, even though the notes were made by the same person. The only note to which "A's" endorsement would attach itself legally would be the thirty-third note, on the back of which was "A's" endorsement.

In the case at bar, we have thirty-three "nomination papers," "made" not by the same persons, but on the face purporting to be made by different persons. How can it be held that the "endorsement," that is, the affidavit, on the

thirty-third nomination paper is legally an "endorsement" or vouchment of the other thirty-two distinct nomination papers? The affidavit does not even purport to apply to all the thirty-three nomination papers, but refers only to "the foregoing nomination *paper*." It doesn't refer to "the foregoing nomination *papers*," and it would not be a compliance with the statute if it did, for the statute says that the signatures on each nomination paper and the qualifications of the signers shall be vouched for by the affidavit of at least five of the signers thereof, which affidavit shall accompany the nomination paper. Sterr's & Boger's Nomination Papers, 5 Dist. R. 663, Simonton, P. J., McPherson, J.: "The act . . . requires every sheet to be complete in itself, containing . . . the names of signers with their occupations, . . . and an affidavit sworn to by at least five of the signers. To sanction loose sheets is to extend invitation to fraud."

### Conclusions as to objection No. 2.

There being, therefore, only one nomination paper accompanied by the affidavit required by law, and this paper containing only thirty-five names of electors, and this not being the required 2 per cent. of the largest entire vote cast for any officer elected in the preceding election for the election district of Lackawanna County for which such nomination papers are designed to be made, this nomination paper must be rejected.

The next question is: Can this nomination paper be amended by having five of the signers of each of the thirty-two nomination papers vouch by affidavit for the genuineness of the signatures on each nomination paper and vouch by affidavit for the qualifications of the signers thereof. We hold that it cannot. The question as to the right to amend nomination papers has been passed upon by at least two courts whose opinions are entitled to great weight. One of these is the Dauphin County Court of Common Pleas, and the other is the Westmoreland County Court of Common Pleas.

In re Petition to Set Aside Paper Purporting to Nominate David Fowler as a Candidate of the Labor Party for Representative in Congress, 27 Dauphin Co. Repr. 289, Hargest, P. J., said:

"It is contended . . . that the Act of Assembly requiring a certificate of such preëmption to be filed 'with the nomination papers' does not mean that it must be filed at the same time and that the filing of the proper preëmption on the following day should be treated as an amendment or supplement to the nomination papers and, being filed before the time for filing nominations had elapsed, makes a valid nomination and secures an exclusive preëmption.

"This Act of Assembly gives to the people who comply with its terms an extraordinary privilege, in that they have the exclusive right to use the name or appellation preëmpted for the election for which a nomination or nominations are made. The Act of Assembly must be strictly construed: Wakefield's Appeal (No. 2), 229 Pa. 585, 586; Barnes' and Heydrick's Nominations, 4 Dauphin Co. Reps. 201, 203; 10 Dist. R. 681; Drake's Nomination, 40 Pa. C. C. Reps. 126.

"In Seward's Nomination, 4 Dauphin Co. Reps. 197, this court held that the Act of 1897 provided the method by which a group or party might protect the name. The court there said: 'If it does not use this method, we think we are powerless to aid it.'

"When the Act requires the certificates to be filed 'with' the nomination papers it certainly does not mean that they may be filed 'after' the nomination papers are filed. We construe it to mean 'together with' or 'simultaneously.'

"In Singer *v.* Delaware, Lackawanna & Western R. R. Co., 254 Pa. 502, it is held: 'When a statute fixes the time within which an act must be done, the courts have no power to enlarge it, although it relates to a mere question of practice:' Schrenkeisen *v.* Kishbaugh, 162 Pa. 45.

"Nor can the filing of the certificate the day after the nomination papers were filed be regarded as an amendment or supplement to the nomination papers. The Act provides that the certificate 'setting forth such a compliance with the Act be filed with the papers.' The purpose of filing the certificate is to show the right of the persons to make the exclusive nomination by the nomination papers filed. In this case there was no such right obtained when the nomination papers were filed. Could the filing of a certificate a day later secure the exclusive right?"

The Dauphin County court then cites with approval the decision of the Court of Common Pleas of Westmoreland County in Cramer's Nomination Papers, 2 D. & C. 46, 48, in which it was held in an opinion by Copeland, P. J.: "If the certificate from the prothonotary had been filed and was not in proper form, it could be amended under the provisions of the Act and amendments above cited. *As to filing the certificate nunc pro tunc, counsel may as well ask to file a nomination petition nunc pro tunc.* The certificate is as much a part of the nomination papers as the petition. The law says when they are to be filed, and this is the last day on which either certificates or petitions or any other nomination papers can be filed."

Judge Copeland quotes the Supreme Court in Wakefield's Appeal (No. 2), 229 Pa. 585, to the effect that nominations made by nomination papers must be in strict compliance with the requirements of the act governing the same. "What the Act requires must be done," says the Supreme Court.

The affidavit required by law to be made on each nomination paper is certainly as much a vital part of the nomination paper as the certificate of preëmption from the prothonotary's office which is required by the Act of July 9, 1919, P. L. 855. The Dauphin County court and the Westmoreland County court both decided that this certificate of preëmption must be filed *at the same time* as the nomination paper and that the act's requiring it to be filed *with* the nomination paper certainly does not mean that it may be filed *after* the nomination paper. The Westmoreland County court held that the certificate is as much a part of the nomination paper as the petition, and that it cannot be filed *nunc pro tunc* any more than a nominating paper could be filed *nunc pro tunc.* Inasmuch as the affidavit required by law to "accompany" the nomination paper is absolutely essential to the validity of said nomination paper and the nomination paper is a mere nullity without it, it follows that this affidavit cannot be made and filed *nunc pro tunc.* This is particularly true when the last day for filing nomination papers has already gone by. In the form sent out by the Secretary of the Commonwealth, the affidavit must "accompany" the nomination paper, as it is on the reverse side of the nomination paper. An affidavit made and filed two weeks after the nomination paper is filed is certainly not an affidavit "accompanying" the nomination paper.

Our attention has been called to this provision of the Act of July 9, 1919, § 2, P. L. 832, amending section 6 of the Act of June 10, 1893, P. L. 419: "If the court decides that the paper objected to was not filed by parties entitled under this Act to file the same, it shall be wholly void; but if it be judged defective only, the court shall indicate the matters as to which it requires amendment and the time within which such amendments must be made."

This court decides that the paper objected to "was not filed by parties entitled under this Act to file the same," and is, therefore, "wholly void."

Who are the parties entitled to file this nomination paper? The statute answers this question. Not merely "qualified electors" alone, but, first, qualified electors who are legally sufficient in number; second, qualified electors who have signed the nomination papers and have added to their signatures, their places of residence and occupations; third, qualified electors whose qualifications and whose signatures "shall be vouched for by the affidavit of at least five of the signers thereof, which affidavit shall accompany the nomination paper."

An analogy to this may be found in voting in cities. An elector who has qualified so far as length of residence in the district is concerned presents himself at the polls to vote at the general election. He is not allowed to vote unless he was duly registered on time, and this shortcoming in his qualifications cannot be overcome by any amendatory act or anything else that he may attempt to do on election day.

When a nomination paper is presented for filing, the Act of July 9, 1919, § 2, P. L. 832 (amending section 6 of the Act of June 10, 1893, P. L. 419), provides: "It shall be the duty of the officer or officers to whom any nomination paper is brought for the purpose of filing to examine such paper, and if it lacks sufficient signatures *or be otherwise manifestly defective,* it shall not be filed."

A nomination paper whose signatures are not properly vouched for is clearly as "manifestly defective" and "void" as though it lacked "sufficient signatures," and this fundamental "defect," like the fundamental "defect" of insufficient signatures, is not amendable, particularly when the last day for filing nomination papers has gone by.

In the case before us there is no merely defective affidavit to be amended; there is no affidavit at all. The nomination paper is, therefore, void, and void nomination papers are not the subject of amendment: Act of July 9, 1919, P. L. 832.

When the nomination papers before us were offered for filing, those whose names were on them were not entitled to file them because, with the exception of the thirty-five persons whose names were on the thirty-third nomination paper, their signatures and their qualifications as electors were not vouched for by the affidavits of five of the signers. Several hundred persons whose signatures and qualifications are not vouched for by oath as the law requires have no more right to file a nomination paper than the same number of non-residents would have. The statute says the required sworn vouchment "must accompany" the nomination paper. The Standard Dictionary defines "accompany" to mean, "to be or occur with; to be connected with." The Secretary of the Commonwealth evidently so defines "accompany," as the blanks furnished by the Secretary (which are the only forms that can be used) provide on the face of them spaces for the names of the candidates and the names and qualifications of the signers, and on the back of them spaces for the affidavit or vouchment. Nomination papers not so accompanied by sworn vouchments, if offered for filing are offered by persons not entitled to file the same, and are void; and void papers are not amendable.

Morgan's Petition (No. 1), 29 Dist. R. 696: "Since the petition does not contain the requisite number of properly qualified electors, it is no nominating petition, and, consequently, should not be open to amendment."

Emerick's Petition, 29 Dist. R. 594: "It is clearly established here that only nine qualified electors have signed the petition (where ten were required). Consequently, there is no valid petition and nothing to amend. To permit an amendment in a case of this character would be legislation, and, in effect,

would be permitting the filing of a nomination petition by the required number of electors subsequent to the last day for filing of such petitions."

The proposed county candidates of these thirty-five signers whose names were on nomination paper No. 33 are not entitled to a place on the ballot of Lackawanna County under the caption "Citizens' Party." It appears from the record that the largest entire vote for any officer elected at the last preceding general election in Lackawanna County was 35,461 votes. Two per cent. of this is 709. Thirty-five qualified electors of Lackawanna County, therefore, had no more right to file this nomination paper and have it accepted than one elector would have.

Even if the entire thirty-three nomination papers were treated as one nomination paper (as respondents ask), the paper fails to comply with the requirements of the statute, that each elector must place his signature, place of residence and occupation thereon. It also fails in another legal essential, in that there is nothing in the affidavit on the thirty-third nomination paper which conveys even an intimation that it applies to any paper but the nomination paper of which it is an integral part, the thirty-third nomination paper.

The law never contemplated that persons should be permitted to file a form of nomination paper and then at some later date have the court point out what valid parts were missing and afford these persons an opportunity to supply such parts. An affidavit of vouchment is as vital a part of a nomination paper as is the prothonotary's certificate or the required number of names. Signatures unvouched for on a nomination paper are worthless. If nomination papers without the affidavit of vouchment can be filed, the door is open to flagrant abuses. Any person could write out the required number of names on a nomination paper, file said paper, and with the nomination thus fraudulently secured, could "shake down" legitimate candidates of legitimate parties or could at least prejudice the rights of said candidates and parties. The courts should not lend themselves to such enterprises. A nomination paper not accompanied by an affidavit of vouchment is deficient in substance and, therefore, void, and void papers are not the subjects of amendment.

A paper that is merely defective is one that contains all the vital elements or substance of a valid paper, but some of which elements are defectively executed. A candidate's name might be misspelled or his address not accurately given. A signer might misstate his address. The affidavit of vouchment might not be completely or correctly filled out or the notary public might forget to attach his seal. All these defects are mere defects in a paper that is complete in substance, and such defects are amendable. A "defect" in a man's eye might be remedied or "amended," but if a vital part of the eye is missing, the eye is beyond "amendment." An affidavit of defence not sworn to at all or not sworn to by a person having the authority to do so is invalid, and the plaintiff in such a case is entitled to judgment for want of affidavit of defence: Wakely v. Sun Insurance Office, 246 Pa. 268; Mintz v. Tri-County Natural Gas Co., 259 Pa. 477; Mancia v. Marquette Ins. Co., 280 Pa. 174.

If a clerk erroneously permits the filing of a manifestly defective nomination paper, such paper may be withdrawn and a valid paper substituted therefor, but, of course, this cannot be done after the last day for filing nomination papers has passed.

In Wakefield's Appeal (No. 2), 229 Pa. 585, the Supreme Court held that, unless the preëmption certificate required by law was filed "with the nomination papers," said nomination papers are irregular and void. Inasmuch as

the affidavit of vouchment is as vital a part of the nomination paper as is the preëmption certificate, we think it follows from the Supreme Court's decision, and also from Cramer's Nomination Papers, 2 D. & C. 46, 48, that a nomination paper that is not accompanied by the affidavit of vouchment required by statute is irregular and void.

Jackson's Petition, 29 Dist. R. 593, Henry, P. J.: "The parties who sign petitions of this character must be qualified electors at the time of signing the nomination petition, and it appearing that at least three of those who signed were not qualified Democratic electors at that time, the petition must be set aside. *It is not amendable, for the reason that there never has been a petition with the required number of electors, and it is, therefore, not amendable.* Another objection to this petition was, that when signed by two of the electors, the blank spaces showing the candidate, his residence, party affiliations, etc., had not been filled up."

Another objection against the allowing of the affidavits to be made now by amendment is this: The objectors to the nomination papers would undoubtedly challenge the truth and good faith of the belated vouchers. What opportunity at this late day would or could the objectors now have to sustain their challenges? Section 2 of the Act of July 9, 1919, P. L. 832, 834, provides that objections to the validity of nomination papers must be made at least twenty-five days before the day of election. If any persons attempted to object to the validity of the belated vouchments, the answer would be that they were too late; and, yet, certainly they could not be expected to object to the vouchments until they were made. Furthermore, the same act provides that in cases of objections, such as those before us, the objections must be "finally determined" by the court at least eighteen days before the day of election. If we allowed the amendments to-day, the time has gone by for any one to object to them, and by to-morrow the time will have gone by for any objections to be "finally determined" by the court.

Morgan's Petition (No. 2), 29 Dist. R. 697: "At this late day the permission of the substitution or addition of other names as signers to the petition, when the time for filing objections has passed, would preclude the raising of any questions with respect to the qualifications of such signers. The nominating petition must be set aside without allowance of amendment."

There is still another fatal objection to the respondents' motion for permission to have five electors make the required affidavit on each one of the aforesaid thirty-two nomination papers. The respondents are in effect asking us to allow five signers on each one of these papers to commit perjury and consummate fraud. The following papers are fraudulent because of the duplication of names and because of the number of names, addresses and occupations in the same handwriting: 1, 3, 5, 6, 8, 10, 11, 12, 13, 14, 15, 17, 22, 24, 25, 27, 28, 29, 31, being nineteen in number.

No persons could subscribe to the statutory oath in the prescribed form on the back of each of said nineteen nomination papers, to wit, that "the signatures attached to the foregoing nomination paper are in the proper handwriting of the qualified electors named therein," without committing perjury. It would be manifestly improper to allow amendments that would serve merely as invitations to the commission of perjury. Even if the court allowed the signatures on the remaining thirteen void nomination papers to be vouched for by the oaths of electors, there would still be before us only fourteen nomination papers containing a total of 490 names, and this number falls 319 short of the required number to nominate candidates for county offices this year in Lackawanna County.

In Lavery's Nomination Papers, 4 D. & C. 437, decided in 1923, under the Act of July 9, 1919, P. L. 855, it was held by Rossiter, J.: "The Act of July 9, 1919, P. L. 855, requires that nomination papers be signed by qualified electors of the electoral district for which the nomination is made, and by at least 2 per cent. of the largest entire vote for any officer elected at the last preceding election in the election district for which the nominations are designed to be made. *The name of each person signed on the petition, as well as the residence and occupation, must be written by the person himself, and if not so written, should not be included in the computation.*"

Gay's Petition, 29 Dist. R. 524, Henry, P. J., specially presiding: The court held that *when a nomination petition indicated fraud and corruption, an amendment could not be allowed.*

In Murray's Petition, 29 Dist. R. 593, Henry, P. J., held that "where the whole affidavit is fraudulent and a forgery, there is nothing to excuse its spurious character, and, consequently, nothing which should move the exercise of the discretion of the court in permitting an amendment."

We decide that the unvouched-for nomination papers before us are void and, therefore, not amendable.

*Third objection:* "A large number of names and groups of names on said petition appear to be in the handwriting of the same individual as respects each particular group of names."

*Fourth objection:* "In the case of a large number of signatures of electors on said petition, the place of residence and occupation of said electors are not written in the handwriting of the said electors and do not appear to have been added by the persons who wrote the names of said electors."

We find these third and fourth objections to be true as a matter of fact. In view of our finding and discussion under the third objection, it is not necessary for us to discuss further the legal effect of these facts.

*Fifth objection:* "The said petition does not contain a sufficient number of valid signatures as required by the Act of Assembly in such case made and provided."

We have already stated that there is only one nomination paper before us that bears on its back the affidavit required by law. This is the thirty-third nomination paper. The thirty-five signatures on this paper do not constitute 2 per cent. of the largest entire vote for any officer elected at the last preceding election in Lackawanna County for which the nominations are designed to be made. Said nomination paper containing thirty-five names is legally insufficient to nominate candidates for county offices.

### Conclusion.

Our conclusion is that the papers before us purporting to be a nomination paper of the "Citizens' Party" of the County of Lackawanna are void for the reasons herein stated.

### Order.

Therefore, now, to wit, Oct. 16, 1925, it is ordered, adjudged and decreed that the nomination papers filed in the office of the County Commissioners of Lackawanna County on Oct. 6, 1925, by persons designating themselves as electors of the "Citizens' Party or Policy," purporting to nominate as the candidates of said "Citizens' Party or Policy" for offices in the County of Lackawanna: Patrick J. McLane, for the office of sheriff; Victor Burschel, for the office of county treasurer; John H. Price, for the office of district attorney; Fred A. Hughes, for the office of prothonotary; Jim Reap, for the office of register of wills; Jacob J. Hartman, for the office of recorder of deeds;

Citizens' Party Nomination Papers.

Edwin A. Harris, for the office of clerk of the courts; and John F. Healey, for the office of jury commissioner, are wholly null and void; that the same be rejected by the County Commissioners of Lackawanna County; and that the names of the aforesaid persons as candidates of the "Citizens' Party or Policy" ticket as aforesaid be omitted from the official ballot for the general election to be held Nov. 3, 1925.

EDWARDS, P. J., concurred.

From William A. Wilcox, Scranton, Pa.